The appellant, Harlan Dale Reeves, was convicted of three counts of first-degree burglary, in violation of §13A-7-5(a)(1), Ala. Code 1975. The trial court sentenced him to serve a term of twenty years in prison. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing.' This appeal followed.
Officer Jim Webster of the Hartselle Police Department testified that, on May 12, 2004, he, Officer Don Carr, and Lieutenant Linda Fox responded to a call at 212 Cherry Street; that, when they approached the house, they heard a woman screaming and saw three people on the ground outside; that the appellant had a rifle under him; and that Anthony Simmons *Page 315 
("Simmons") and his daughter appeared to be wrestling and struggling to get the rifle.
Lieutenant Linda Fox of the Hartselle Police Department testified that, on May 12, 2004, she responded to a call at 212 Cherry Street; that the appellant was on the ground and had a rifle under him, and Simmons was on top of him; that, after they restrained the appellant and Simmons, Simmons said that the appellant had gone into his house; that she did not enter Simmons' house; and that she did not see any evidence that the appellant had been in Simmons' house.
Simmons testified that he had previously married and divorced Kim Simmons ("Kim"), that they had a child together, and that they had remarried at the time of the trial; that Kim was married to the appellant for a while in between the times he and Kim were married; and that, on May 12, 2004, Kim's vehicle was at his house because their daughter had borrowed it. He also testified that the appellant opened the door and stepped one or two steps into the sunroom, where he slept, and that he yelled; that the appellant had a rifle in his hand; that he grabbed the rifle and hit the appellant in the head with it; and that they struggled over the rifle and ended up outside. At that point, the appellant unloaded the rifle, asked him to let him go, and said that they would not have any more problems out of him.
Captain Tom Sparks of the Hartselle Police Department testified that he was a lieutenant over investigations on May 12, 2004. He also testified that he talked to the appellant around 2:00 the next morning and that the appellant made the following statement about the incident:
 "I was at home and I wanted to know where my wife was. We have been living apart since January 20th, 2004. I decided to go to Hartselle to her ex-husband's house to look for her because I'm not allowed to go to her mother's house where she is staying. Before I left the house, I put on some camouflage clothes because it was raining and they are waterproof. I decided to take a mask to wear because I thought I would get cold. I wore the rubber gloves because I didn't want my fingerprints on the gate when I went in the backyard to look for her car. I took my 44-40 rifle with me for my own protection because Mr. Simmons told me that he would kill me. Mr. Simmons is my wife's ex-husband's father. I also decided to take some hot dogs with me to feed the dog next door so he would be quiet.
 "Before I — I'm sorry. Before I left my house, I hid my truck and decided to walk to Hartselle. I did not want my truck to be seen, plus, I did not want it to get impounded if something happened. I hitched a couple of rides from Moulton to Hartselle. I hid the gun under my clothes on my back so no one would see it. I had the binoculars because I keep them with me all the time. When I got to the Simmons' residence, I walked to the backyard and I opened the gate. I looked in the backyard and saw her car. I shut the gate and started to walk away, and Anthony, my wife's ex-husband, ran out the side door and tackled me. Anthony grabbed the gun from me and hit me over the head with it and broke the stock. Then his daughter, Navada, came out of the house and grabbed me around the throat and tried to choke me to death. They both kept hitting me until the police got there. I told them that if they would let me go, I would leave and never bother them again.
 "We've been having problems, my wife and I. We have been going to *Page 316 
church and counseling. I've been staying with her some at her mother's and some at my house since we started having problems. She has lied to me ever since we have been married about seeing her ex-husband, Anthony Simmons. She has been seeing him ever since we have been married. Tonight I just needed to know one last time that she was with him."
(R. 155-57.)
Kim testified that she married the appellant in August 2003 and that they separated and got back together several times; that she had been married to Simmons before that; and that she and Simmons got back together in April 2004. She also testified that she and the appellant had had problems; that the appellant had accused her of cheating on him with several people; and that the appellant had stalked her. Kim testified that, on May 12, 2004, she swore out a complaint against the appellant for domestic violence; that a restraining order was issued against the appellant; and that the appellant was arrested and released on bond that day.
Before the jury started its deliberations, some of the jurors asked the trial court to go back over the elements of each offense. Also, after the jury had started its deliberations, the foreperson indicated that the jury might be deadlocked, and the trial court gave an Allen or dynamite charge. Shortly thereafter, the jury returned its verdict.
The appellant argues that he "was wrongfully denied his constitutional right to testify in his own defense due to ineffective representation of counsel." (Appellant's brief at p. 13.) Specifically, he contends that he insisted that he wanted to testify, but his counsel refused to allow him to do so.
After the State rested, the following occurred:
 "[THE COURT:] Just for planning purposes, [defense counsel], so that I don't march the jury in and then march them right back out again, are you planning on calling some witnesses in the case?
 "[DEFENSE COUNSEL]: Judge, could you give me about five minutes to decide that?
 "THE COURT: Let me do that, and of course, you know, I don't know, your client may or may not testify, and if he decides that he doesn't want to testify, I want to make sure we have that on the record.
 "[DEFENSE COUNSEL]: Yes, sir, Judge. Could you give us until 15 after and I can let the court know if I'm going to present witnesses.
 "THE COURT: We will take a 10-minute break. We will be in recess for 10 minutes.
 "(Whereupon, a recess was taken at 2:07 p.m.)
 "(Whereupon, the following was held outside the presence of the jury.)
 "THE COURT: All right. [Defense counsel,] it's my understanding that the Defendant intends to go ahead and rest; is that correct?
 "[DEFENSE COUNSEL]: That's correct, Your Honor.
 "THE COURT: All right. And he's not going to testify on his own behalf?
 "[DEFENSE COUNSEL]: No, he's not.
 "(Whereupon, an off-the-record discussion took place.)"
(R. 210-12.)
During the sentencing hearing, the appellant, who was represented by new counsel, stated the following: *Page 317 
 "I'm really dissatisfied with my previous lawyer, the fact he didn't let me testify and let me tell my side. I was begging him with tears in my eyes on my knees in front of my family, please, let me tell my side, and he never gave me any indication whatsoever that we had any problem here, you know, with this case. He had never cussed at me at any time in the whole two years. The first day of court, in your presence, he cussed me.
 ". . . .
 ". . . — what I did over there that night, I had no intentions of going in that house whatsoever, and I did not go in that house. I want you to know I did not step one foot in there. I guess that's irrelevant now, but the fact of the matter is I didn't get a chance to tell you, you know, nothing about what happened."
(R. 277-80.)
In his motion for a new trial, the appellant alleged, in pertinent part, that he
 "was insistent that he be allowed to testify in his trial. However, he was overruled by his defense counsel and not allowed to testify and not informed that he had [the] right to testify if he desired, even if his decision to testify was contrary to the advice of counsel. [He] would show that he would have testified consistent with his statement he made to police investigators . . . which supports his position that he did not enter the dwelling of Anthony Simmons. . . ."
(C.R. 148.) In his affidavit in support of his motion for a new trial, the appellant stated, in pertinent part:
 "I told [trial counsel] like I told the police that I did not go into the house where Anthony Simmons was staying.
 ". . . On the first day of the trial, [trial counsel] told me that he would not put me on the stand to testify. When the state rested, the judge put the court in recess for a break. At that time, [trial counsel] talked with me about testifying. Also present for this discussion were my mother Ora Dean Smith, my step-father Larry Smith, my brother Jeffrey Reeves and my girl friend Julie Cole.
 ". . . [Trial counsel] told me that he was not going to put me on the stand. I pleaded with him to let me look the jury in the eye and tell them that I did not go into the house. He told me again that I was not going to be allowed to testify. I was told that the prosecutor would `eat my lunch,' which I took to mean that he would be able to cross-examine me. I told [trial counsel] that I did not care that I still needed to testify to the truth about me not going into the house. I was emotional and crying and pleading to be allowed to testify. He cannot have gathered from what he was seeing that I agreed with his plan not to put me on the stand. I was never told that I had the right to testify even if my lawyer advised that I should not testify. [Trial counsel] never led me to believe that I could make this decision during the break after the State rested. When he kept telling me that he was not going to put me on the stand or that he was not going to allow me to testify, I gathered that whether I testified was his decision, not mine."
(C.R. 62.)
The appellant also submitted several other affidavits in support of his motion for a new trial. In his affidavit, Jeffrey Reeves, the appellant's brother, stated, in pertinent part:
 "I also heard my brother say, `I want to testify; it's my life.' I feel like the decision not to testify was made for him, not by him. [The appellant] was not asked by the judge or his lawyer whether or not he wanted to testify." *Page 318 
(C.R. 64.) In his affidavit, Larry Smith, the appellant's stepfather, stated, in pertinent part:
 "[Trial counsel] did not give [the appellant] a clear choice of whether or not to testify in his own defense, although [the appellant] begged and pleaded in tears to be allowed to take the stand and testify to the facts in the case. [The appellant] stated that he did not enter the house in question. The attorney said no; he would not put [the appellant] on the stand."
(C.R. 65.) In her affidavit, Julie Cole, the appellant's girlfriend, stated:
 "At the time that [trial counsel] was supposed to put the defendant on the stand, the Court called a recess to allow the attorney to confer with [the appellant]. I heard the attorney stated that in his opinion he did not want to put [the appellant] on the witness stand because the prosecutor . . . would `eat him alive.' At that time, [the appellant] began sobbing and begging the attorney to please let him `look at the jurors and tell them the truth' because it was his life and he `Wanted to testify.' [Trial counsel] refused to allow him to testify."
(C.R. 66.) Finally, in her affidavit, Ora Dean Smith, the appellant's mother, stated:
 "[Trial counsel] did not give [the appellant] a choice in whether or not he should testify in his own defense. [The appellant] was crying profusely and repeatedly asked the attorney to please let him look at the jurors and tell them the truth in the case. He said that he `wanted to tell them that I did not enter the house and that this is my life and I don't want to go to prison for something that I did not do. I know that I can convince them that I am not guilty.' Regardless of [the appellant's] begging and pleading to be allowed to testify, the attorney said no and he did not let him testify."
(C.R. 67.)
In its order denying the appellant's motion for a new trial, the trial court stated:
 "At the close of the State's evidence and the court's denial of the defendant's motion for judgment of acquittal, the court recessed the trial to allow him and his counsel to confer about calling witnesses. At the end of the recess, the court stated on the record with all parties present in open court its understanding that the defendant intended to rest without calling any witnesses and that the defendant was not going to testify in his own behalf. His counsel acknowledged that his client would not testify. The defendant made no statement or comment expressing his disagreement with counsel's statement (Tr. at 211-12). He and certain of his family members now say that the defendant's trial counsel absolutely refused to allow him to testify in his own behalf and did not tell him he had a right to testify regardless of his attorney's opinion about the wisdom of his doing so. For the purpose of ruling on this Motion, the court is accepting as true the factual allegations of the defendant and his family members.
 "The court is aware of the plurality holding in United States v. Teague, 953 F.2d 1525 (11th Cir.1992), that an accused has a fundamental right to testify in his own defense at trial. The court does not accept, however, that this right is absolute and is persuaded that the [parameters] of this right — in the context of a disagreement between the defendant and his trial counsel about whether or not he should testify — are governed by the more common sense and practical principles explained in, the *Page 319 
concurring opinions authored by Judge Edmondson and Judge Birch in Teague.
 "A defendant's right to testify is limited to the right to be free from governmental interference with his testifying. No allegation is made by the defendant Reeves in this case that any government officer or official interfered with this testifying in his own behalf. Defense counsel violates this right and becomes ineffective only when the value of the defendant's testimony for gaining an acquittal or mitigating the potential sentence is so great and obvious that no reasonable lawyer under the circumstances would exclude his client's testimony at trial. The defendant Reeves has presented no evidence in support of his Motion that, under the particular circumstances of his case, his trial attorney acted unreasonably or below the standard of care applicable to reasonable lawyers in deciding to exclude his testimony during the trial.
 "Once an accused decides to fight the charges against him and have counsel represent him in that fight, then the defense attorney need not defer to his client's desires on how the fight is to be waged. To allow the accused the last word on the decision about whether or not he is to testify makes the client his own lawyer and turns upside down the more fundamental constitutional requirement that he receives a competent defense by means of the assistance of counsel. Moreover, it places the trial judge in the position of having to conduct a trial within a trial, which may involve a quest for information that should be protected by the lawyer-client privilege, to decide if the client's decision to testify is fully informed and prudent under the circumstances. This all but guarantees prohibited government involvement and perhaps interference with the defendant's right to testify, as well as judicial disturbance of trial strategy and defense counsel's more knowledgeable decisions about how to most effectively represent his client.
 "The court concludes, therefore, that the defendant's trial attorney did not provide ineffective assistance by preventing his client from testifying at trial. But even if he did violate the defendant's right to testify, such violation was harmless. During its case in chief, the State admitted into evidence the defendant's exculpatory written statement in which he denied committing the charged burglary. The defendant got his testimony presented to the jury without subjecting himself to cross-examination and the potential revelation of damaging information about his past conflicts and problems with his former wife."
(S.C.R. 2; C.R. 15.)
Alabama courts have not directly addressed the specific argument the appellant raises. Therefore, we have looked to other jurisdictions for guidance. In U.S. v. Teague,953 F.2d 1525, 1530-35 (11th Cir.1992), the United States Court of Appeals for the Eleventh Circuit addressed a similar situation as follows:
 "Teague . . . argues that his attorney deprived him of his constitutional right to testify in his own behalf when she rested the defense case without calling him to the stand, despite his repeated indications that he wanted to testify. The government responds that Teague waived his right to testify either because he did not affirmatively assert that right during his trial or because he knew of his right to testify yet acquiesced in his attorney's decision not to call him as a witness.
 "It is clear that a criminal defendant has a constitutional right to testify in his own behalf at his trial. Although historically *Page 320 
criminal defendants were prohibited from testifying because of their interest in the outcome of the trial, that view has long since been abandoned. Indeed, the United States Supreme Court has recognized that there is `no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case,' Ferguson v. Georgia, 365 U.S. 570, 582, 81 S.Ct. 756, 763, 5 L.Ed.2d 783 (1961), and that `[i]t is now accepted . . . that an accused has a right . . . to testify on his own behalf.' Faretta v. California, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975).
 "The constitutional stature of this right was expressly recognized by the Supreme Court in Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In Rock, the Court considered whether `a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis testimony.' Id. at 53, 107 S.Ct. at 2709. As a preliminary matter, the Court discussed the development of the right to testify. Although the right to testify is not explicitly stated in the Constitution, the Supreme Court noted that it `has sources in several provisions of the Constitution.' Id. at 51, 107 S.Ct. at 2708. The Court first cited the due process clause of the Fourteenth Amendment, stating that the right to be heard, which is so essential to due process in an adversary system of adjudication, [can] be vindicated only by affording a defendant an opportunity to testify before the factfinder.' Id. at 51 n. 8, 107 S.Ct. at 2709 n. 8. The Court also cited to Justice Clark's concurring opinion in Ferguson v. Georgia for the proposition that the Fourteenth Amendment secures the `right of a criminal defendant to choose between silence and testifying in his own behalf.' 365 U.S. at 602, 81 S.Ct. at 773 (Clark, J., concurring). Next, the Court found support in the compulsory process clause of the Sixth Amendment, stating that `[l]ogically included in the accused's right to call witnesses whose testimony is "material and favorable to his defense," is a right to testify himself, should he decide it is in his favor to do so.' Rock, 483 U.S. at 52, 107 S.Ct. at 2709
(citation omitted). Moreover, the Court recognized that under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Sixth Amendment includes the right of self-representation, and that `[a] defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.' Rock, 483 U.S. at 52, 107 S.Ct. at 2709. Lastly, the Court found that the right to testify `is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony.' Id. With this discussion, the Court put to rest any doubt that a criminal defendant has a constitutional right to testify in his own defense.
 "However, this right is not unlimited. For example, the right to testify clearly does not include the right to commit perjury. See Nix v. Whiteside, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Nevertheless, as the Supreme Court stated in Rock, `restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve.' 483 U.S. at 55-56, 107 S.Ct. at 2711-12; cf. Chambers v. Mississippi 410 U.S. 284, 295, 302, 93 S.Ct. 1038, 1045, 1049, 35 L.Ed.2d 297 (1973) (The defendant's right to present witnesses in his own defense is subject to other legitimate interests in the criminal trial process *Page 321 
such as the established rules of evidence and procedure.)
 "In the case at bar, however, Teague claims that he was prevented from testifying, not by the government or the court, but by his own lawyer. We are thus called upon to determine whether defense counsel is empowered to waive defendant's right to testify.
 "Criminal defendants possess essentially two categories of constitutional rights: those which are waivable by defense counsel on the defendant's behalf, and those which are considered `fundamental' and personal to defendant, waivable only by the defendant. Generally included in the former are matters which primarily involve trial strategy and tactics. See Henry v. Mississippi 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). Examples of such matters are what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed. See 1 Standards for Criminal Justice, Standard 4-5.2 comment (2d ed.1980). Examples of fundamental decisions which only the defendant is empowered to waive are entry of a guilty plea, Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), waiver of a jury trial, Adams v. United States ex rel. McCann, 317 U.S. 269, 277-78, 63 S.Ct. 236, 240-41, 87 L.Ed. 268 (1942), and whether to pursue an appeal, see Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 848, 9 L.Ed.2d 837
(1963).
 "In Rock, the Supreme Court did not need to decide whether the constitutional right to testify was fundamental in character, and therefore personal to the defendant, or whether it could be waived by the defense attorney. However, the Court in Rock
emphasized that the right to testify `is one of the rights that "are essential to due process of law in a fair adversary process,"' 483 U.S. at 51, 107 S.Ct. at 2708 (quoting Faretta, 422 U.S. at 819 n. 15, 95 S.Ct. at 2533 n. 15), and that it is `[e]ven more fundamental to a personal defense than the right of self-representation,' id. at 52, 107 S.Ct. at 2709. Moreover, the Court noted that it has `[o]n numerous occasions . . . proceeded on the premise that the right to testify on one's own behalf in defense to a criminal charge is a fundamental constitutional right' Id. at 53 n. 10, 107 S.Ct. at 2710 n. 10 (emphasis added). Perhaps the most telling of these occasions cited by the Court is Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983), in which the Court stated in dicta that `the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.' (Emphasis added.) Thus, in Rock, the Supreme Court has clearly and strongly indicated that the constitutional right to testify should be treated as fundamental.
 "Although the Supreme Court has not expressly addressed this question, this is not the first time it has come before this court. In Wright v. Estelle, 572 F.2d 1071 (5th Cir.) (en banc), cert. denied, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978), the former Fifth Circuit was presented with the issue of whether a defendant has a fundamental right to testify. During Wright's trial, a conflict arose between Wright and his court-appointed counsel about whether Wright would testify in his own defense. The lead defense counsel told Wright that he would no longer represent him if Wright elected to testify. The plurality affirmed the panel opinion which assumed without deciding that there was a constitutional and fundamental right to testify, *Page 322 
but found that in that case the error was harmless because the evidence was overwhelming. Wright v. Estelle, 549 F.2d 971 (5th Cir.1977) (panel opinion). . . .
 ". . . .
 "More recently, this question was addressed by a panel of this court in United States v. Scott, 909 F.2d 488 (11th Cir.1990) (Fay and Johnson, Circuit Judges, and Gibson, Senior Circuit Judge for the Eighth Circuit sitting by designation). During Scott's trial, defense counsel moved to withdraw from the case but would not give the reasons for this request to the trial court. The court assumed that this was because Scott desired to testify but the attorney intended to keep him off the stand. Rather than ruling on this motion, the court gave Scott a choice: either proceed with counsel, but relinquish the right to testify, or proceed pro se. This court reviewed the development of the right to testify and concluded that it was now a recognized fundamental constitutional right, personal to the defendant, which cannot be waived by defense counsel. This court then found that the trial judge had improperly forced the defendant to choose between two constitutional rights, the right to counsel and the right to testify, and therefore vacated defendant's conviction and remanded for a new trial.
 "We now reaffirm that a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel.
 "Under the Supreme Court's reasoning in Rock, the right to testify essentially guarantees the right to ultimately choose
whether or not to testify. The Supreme Court stated that the right to testify is `a necessary corollary to the Fifth Amendment's guarantee against compelled testimony.' Rock, 483 U.S. at 52, 107 S.Ct. at 2709. The Court then quoted from Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971): `Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.' A criminal defendant clearly cannot be compelled to testify by defense counsel who believes it would be in the defendant's best interest to take the stand. It is only logical, as the Supreme Court has recognized, that the reverse also be true: A criminal defendant cannot be compelled to remain silent by defense counsel.
 "The decision whether a criminal defendant should take the witness stand in his own trial unquestionably has tremendous strategic importance. Nevertheless, the mere fact that such a decision involves trial strategy does not itself mandate that the decision ultimately rest with defense counsel. Nor does our conclusion place the right to testify in conflict with the right to counsel. Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an `intentional relinquishment or abandonment of a known right or privilege.' Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added). Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to *Page 323 
take the stand with the advice of competent counsel.
 "It is important to remember that while defense counsel serves as an advocate for the client, it is the client who is the master of his or her own defense. See Mulligan v. Kemp, 771 F.2d 1436, 1441 (11th Cir.1985) (Trial counsel `is still only an assistant to the defendant and not the master of the defense.'), cert. denied, 480 U.S. 911, 107 S.Ct. 1358, 94 L.Ed.2d 529 (1987); Model Rules of Professional Conduct rule 1.2 
comment. When an individual stands accused of criminal conduct, the choice to tell his side of the story has ramifications far beyond the more immediate goal of obtaining an acquittal. It is, after all, the defendant's day in court. The decision to take the stand in his own defense, like the decision to plead not-guilty and proceed to trial, provides the defendant with an opportunity directly to meet the charges against him. `The wisdom or unwisdom of the defendant's choice does not diminish his right to make it.' Wright, 572 F.2d at 1079 (Godbold, J., dissenting). By exercising his constitutional right to the assistance of counsel, a defendant does not relinquish his right to set the parameters of that representation. Any other conclusion would be `to imprison a man in his privileges and call it the Constitution.' Adams, 317 U.S. at 280, 63 S.Ct. at 242.
 "We also note that our conclusion is consistent with the generally accepted practice within the bar. For example, the American Bar Association's Standards for Criminal Justice provide:
 "(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:
 "(i) what plea to enter;
 "(ii) whether to waive jury trial; and
 "(iii) whether to testify in his or her own behalf.
 "1 Standards for Criminal Justice Standard 4-5.2(a) (2d ed.1980) (emphasis added). The commentary to this provision states that `because of the fundamental nature of these three decisions, so crucial to the accused's fate, the accused must make the decisions.' Id. commentary. Further, Rule 1.2(a) of the American Bar Association's Model Rules of Professional Conduct states that:
 "(a) A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. . . . In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
 "(Emphasis added.) Therefore, our decision places no greater responsibility on defense counsel than is already required by the ethical standards of the legal profession.
 ". . . .
 "In summary, we hold that a criminal defendant has a fundamental constitutional right to testify on his behalf, that this right is personal to the defendant, and that the right cannot be waived by defense counsel. Where the defendant claims that this right was violated by defense counsel, this claim is properly framed as a claim of ineffective assistance of counsel."
(Footnotes omitted.)
Also, in Nichols v. Butler, 953 F.2d 1550, 1552-54
(11th Cir.1992), the *Page 324 
United States Court of Appeals for the Eleventh Circuit addressed a similar ineffective-assistance-of-counsel claim as follows:
 "In this case, the district court found that Nichols did not voluntarily choose not to testify, but instead was coerced into silence by his counsel's threat to withdraw from the case in mid-trial. Nichols argues that he was denied both the effective assistance of counsel and his right to testify by the actions of his attorney. We agree.
 ". . . .
 "The performance of Nichols' trial attorney in this case was clearly deficient. In Teague, . . . we noted that the first prong of the Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),] test would be met `if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand.' Teague, at 1534.
 ". . . .
 "We also find that the second requirement of Strickland — that counsel's errors prejudiced the defense — has been met. The testimony of a criminal defendant at his own trial is unique and inherently significant. `The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.' Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961). When the defendant testifies, the jury is given an opportunity to observe his demeanor and to judge his credibility firsthand. As the United States Supreme Court noted in Rock v. Arkansas, 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987), `the most important witness for the defense in many criminal cases is the defendant himself.' Further, in a case such as this where the question was not whether a crime was committed, but whether the defendant was the person who committed the crime, his testimony takes on even greater importance. Indeed, `[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance.' United States v. Walker, 772 F.2d 1172, 1179 (5th Cir.1985).
 "This was a very close case; the only evidence that Nichols was the person involved in the robbery was the eyewitness identification of him by a store employee who had glimpsed him only briefly. If Nichols had testified, he could have presented his version of the events of that evening in his own words. The jury would then have been able to weigh his credibility against that of the store employee's perception. Moreover, Nichols' testimony would have been supported by the exculpatory testimony of Donald Hannah. Under these circumstances, there is at least a reasonable probability that, but for counsel's unprofessional conduct, the result in this case would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. We hold that Nichols received constitutionally ineffective assistance of counsel."
(Footnotes omitted.)
Although we have not addressed the specific issue the appellant raises, this court has recognized the decisions inNichols and Rock; has acknowledged that a defendant's right to testify is a fundamental, personal right; and has concluded that a waiver of the right to testify must be made knowingly and voluntarily. In Ex parte McWilliams,640 So.2d 1015, 1021 (Ala. 1993), our supreme court stated:
 "The right of a criminal defendant to testify at his own trial is fundamental and personal to the defendant. Nichols *Page 325 v. Butler, 953 F.2d 1550, 1552 (11th Cir. 1992); Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). `It is basic that every person has the right in all criminal prosecutions to be heard by himself and counsel, or either . . . to testify in his own behalf, if he elects to so do.' Carter v. State, 424 So.2d 1336, 1340 (Ala.Crim.App. 1982) (citations omitted). A criminal defendant's decision not to testify in his own behalf must be made knowingly and voluntarily. Streeter v. State, 406 So.2d 1024
(Ala.Crim.App.), cert denied, Ex parte Streeter, 406 So.2d 1029 (Ala. 1981), cert denied, Streeter v. Alabama, 456 U.S. 932, 102 S.Ct. 1984, 72 L.Ed.2d 450 (1982)."
See also Carter v. State, 424 So.2d 1336
(Ala.Crim.App. 1982) (holding that the appellant did not prove that he was denied the right to testify where the evidence showed that he made the decision not to testify on his own behalf after conferring with friends and his attorney);Streeter v. State, 406 So.2d 1024 (Ala.Crim.App. 1981) (holding that neither trial counsel nor the trial court interfered and that the appellant knowingly and voluntarily made the decision not to testify on his own behalf).
We agree with the reasoning and holding of Teague. A defendant has a fundamental right to testify on his own behalf, that right is personal to the defendant, and defense counsel may not waive that right. See El-Tabech v. Hopkins,997 F.2d 386 (8th Cir.1993); Hernandez v. Bugger, 829 F.Supp. 372 (M.D.Fla.1992). To the extent the trial court found otherwise, its conclusion was erroneous.
In this case, the trial court accepted as true the allegations of the appellant and his family members. Based onTeague, and contrary to the trial court's findings, we conclude that those allegations support a finding that trial counsel rendered deficient performance by not allowing the appellant to testify on his own behalf after he insisted that he wanted to do so.
In the alternative, the trial court found that any violation of the appellant's right to testify on his own behalf was harmless because the State admitted into evidence the appellant's statement in which he denied committing the charged burglary and because the appellant got his testimony into evidence without subjecting himself to cross-examination and the potential revelation of damaging information about his past conflicts and problems with his former wife. We disagree. As was the situation in Nichols, this was a very close case in which the victim was the only witness who testified that the appellant entered the residence. In fact, some of the jurors asked that the trial court go over the elements of the offenses again, and the foreperson later indicated that the jury might be deadlocked. Also, contrary to the State's assertion and the trial court's finding, in his statement, the appellant implied that he did not enter the residence, but he did not specifically say that he did not. If he had testified on his own behalf, he could have specifically told the jury that he did not enter the residence, and the jury could have judged his credibility against the victim's. Finally, Kim testified that the appellant had stalked her and that a restraining order had been entered against him. Neither the trial court nor the State has identified any additional information in this regard that might have been revealed on cross-examination. Under these circumstances, we conclude that trial counsel's deficient performance prejudiced the appellant and that the deprivation of his right to testify on his own behalf was not harmless. Seegenerally Jordan v. Hargett, 34 F.3d 310 (5th Cir.1994).
For the above-stated reasons, we conclude that the appellant's trial counsel rendered *Page 326 
ineffective assistance by depriving him of his right to testify on his own behalf and that the deprivation was not harmless. Therefore, we reverse the trial court's judgment and remand this case for proceedings that are consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, WISE, and WELCH, JJ., concur; SHAW, J., concurs in the result, with opinion.